## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69925-3-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| HAILU DAGNEW MANDEFERO, | ) | UNPUBLISHED |
| | ) | |
| Appellant. | ) | FILED: June 1, 2015 |
| | ) | |

Cox, J. — Hailu Mandefero appeals his judgment and sentence, claiming that the evidence is insufficient to support his convictions of first degree assault, second degree assault, and second degree unlawful possession of a firearm. Specifically, he contends that there is insufficient evidence to establish identity. Reviewing the evidence in the light most favorable to the State, it is clear that a rational trier of fact could find beyond a reasonable doubt that Mandefero committed all three crimes. We affirm.

All three charges were based on a shooting that occurred in May 2012 at Ezell's Chicken in Skyway. During this incident, Jae Brione Gary was shot multiple times as he sat in his car parked in front of this restaurant. Two of the shots fired at Gary's car missed him and went through the windows of the restaurant, where Sandra Torres was working. The shots were fired from the

vicinity of a truck that had pulled in behind Gary's car as he sat talking with his cousin.

Police responded to the scene of the shooting and spoke with Gary before he was transported to the hospital for his wounds. Gary was, at first, reluctant to say who shot him while being questioned near a small crowd of bystanders. But he did identify his shooter once he was in the confines of the ambulance that later transported him to the hospital. Specifically, he stated that he was shot by "Halua" from Money Gang.[1] He also said he would point out his assailant in a high school yearbook.

Police officers arrested Hailu Mandefero later that night. At the time of his arrest, he was at a hospital with his friend, Kevin Hubbard. Mandefero gave inconsistent statements to police about his whereabouts and activities earlier that evening.

The State charged Mandefero with assault in the first degree of Jae Brione Gary, assault in the second degree of Sandra Torres, and unlawful possession of a firearm in the second degree. The two assault charges included firearm allegations pursuant to RCW 9.94A.553(3).

Gary refused to speak with the investigating detective and did not respond to the detective's attempts to contact him. Thus, the State obtained a material witness warrant for Gary, who testified at trial. He testified that after the shooting he told police who responded to the scene that his assailant was Hailu and that he was talking about Mandefero. But he recanted his earlier identification of

---

[1] Clerk's Papers at 4-5; see also Ex. 9 and 10.

Mandefero. He claimed it was Hubbard that shot him and that he could not see anyone else in the truck that pulled in behind his car at Ezell's.

At trial, the State also presented the testimony of Deputy Michael Glasgow, one of the officers who responded to the shooting at Ezell's. He testified that he was with Gary in the ambulance just after the shooting and that Gary told him that "Hailu and some ni[**]ers" had shot him.[2] Deputy Glasgow also testified that Gary told him he would point out this person in a yearbook and that this person was associated with the "Money Gang." The jury also heard a recording of Gary's statements to Deputy Glasgow in the ambulance that the deputy made on his cellphone.

Mandefero did not testify and rested without presenting any evidence. His theory of defense during closing argument was that the State "got the wrong guy."[3] Defense counsel focused on Gary's testimony at trial identifying Hubbard as the assailant and argued that Hubbard acted alone.

The jury found Mandefero guilty of all crimes, as charged.

Mandefero appeals.

## SUFFICIENCY OF THE EVIDENCE

Mandefero argues that the evidence is insufficient to support his three convictions. Specifically, he contends that there is insufficient evidence to establish identity. We hold that the evidence in this record supports the jury verdicts in all respects.

---

[2] Report of Proceedings (Oct. 24, 2012) at 146.

[3] Report of Proceedings (Nov. 6, 2012) at 36.

Due process requires the State to prove beyond a reasonable doubt all the necessary facts of the crime charged.[4] "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt."[5] "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant."[6] A reviewing court need not be convinced of the defendant's guilt beyond a reasonable doubt, but only that substantial evidence supports the State's case.[7]

A trier of fact may properly render a guilty verdict based on circumstantial evidence alone, even if the evidence is also consistent with a hypothesis of innocence.[8] Circumstantial evidence and direct evidence are equally reliable.[9]

This court defers to the trier of fact on "issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence."[10] "Credibility determinations are for the trier of fact and are not subject to review."[11]

---

[4] State v. Colquitt, 133 Wn. App. 789, 796, 137 P.3d 892 (2006).

[5] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

[6] Id.

[7] State v. Fiser, 99 Wn. App. 714, 718, 995 P.2d 107 (2000).

[8] State v. Kovac, 50 Wn. App. 117, 119, 747 P.2d 484 (1987).

[9] State v. Thomas, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).

[10] Id. at 874-75.

[11] Id. at 874.

A person commits the crime of assault in the first degree under RCW 9A.36.011(1)(a) when, with intent to inflict great bodily harm, he assaults another with a firearm or deadly weapon or by any force or means likely to produce great bodily harm or death.

A person commits the crime of assault in the second degree under RCW 9A.36.021(1)(c) when he assaults another with a deadly weapon.

A person commits the crime of unlawful possession of a firearm in the second degree under RCW 9.41.040(2)(a)(i) when he has previously been convicted of a felony and knowingly has in his possession or control a firearm.

Here, Mandefero does not challenge the sufficiency of the State's evidence that the three crimes were committed. Rather, he challenges the sufficiency of the evidence that he was the shooter. We conclude that there is sufficient evidence to establish his identity as the shooter.

First, evidence indicated that Mandefero had a motive to shoot Gary. Gary testified at trial that he had a "beef" with Mandefero.[12] He described an incident a couple of weeks before the shooting where he stole Mandefero's chain necklace in front of a crowd of people.[13] Gary testified that he did this because he thought Mandefero had cheated his cousin out of money.[14]

The jury also heard the recording of a jail phone call after Mandefero was arrested on these charges. The speaker referenced this chain necklace incident

---

[12] Report of Proceedings (Oct. 24, 2012) at 80.

[13] Id. at 80-94.

[14] Id. at 81.

5

stating, "Ain't nobody gonna snatch your chain ever again, promise you that."[15] Mandefero laughed in response. This conversation further suggests that the chain necklace incident was the motive for the shooting.

Mandefero does not point to any evidence to refute this evidence of motive. Accordingly, we conclude that there is sufficient evidence to support the State's theory that Mandefero had a motive to seek revenge against Gary for stealing his chain necklace by shooting him. This is circumstantial evidence that Mandefero was the shooter.

Second, there was also evidence that Mandefero had the opportunity to shoot Gary. Mandefero had his cell phone when he was arrested at the hospital following the shooting. Call records for Mandefero's phone and Hubbard's phone were admitted into evidence at trial.[16] The phone records contain call logs that list both incoming and outgoing calls for both phones that night. The records also show the specific cell phone towers that each phone used to transmit these calls.

The jury heard testimony that when a phone call is made, it generally uses the nearest tower of the phone's service provider.[17] There are many factors that affect cell tower reception, but generally, when a certain tower is identified, the phone is within a three mile radius of the tower. [18]

---

[15] Ex. 46; Ex. 43.

[16] Ex. 62; Ex. 63.

[17] Report of Proceedings (Nov. 5, 2012) at 39.

[18] Id. at 37-40, 43, 54-55.

The cell tower records indicate that both Mandefero and Hubbard traveled a path that corresponded to the State's theory of the case. Both men were north of Ezell's prior to the shooting. An incoming call placed Mandefero north of Ezell's at 8:43:05 p.m.[19] An incoming call to Hubbard's phone at 8:43:36 p.m. shows that Hubbard was also north of Ezell's at that time.[20] Another incoming call at 9:05 p.m. showed that Mandefero had moved south, in the direction of Ezell's.[21] After the shooting, both men were moving south of Ezell's.[22] In short, the cell phone records support the State's theory that Mandefero was with Hubbard in the area of the shooting around the time of the shooting.

Additionally, the records show that neither Mandefero nor Hubbard used his phone at the time of the shooting.[23] Mandefero did not use his phone between 9:05 p.m. and 9:14 p.m.[24] Hubbard did not use his cell phone between 8:43 p.m. and 9:10 p.m.[25] This is further circumstantial evidence that Mandefero had the opportunity to shoot Gary.

---

[19] See Ex. 66.

[20] See Ex. 65.

[21] See Ex. 66.

[22] See Ex. 65; Ex. 66.

[23] See Ex. 65; Ex. 66.

[24] See Ex. 63.

[25] See Ex. 62.

Mandefero challenges what is to be derived from the cell phone evidence. But his challenges go to the weight of the evidence, something that the jury decided against him. Thus, his arguments are not persuasive.

We turn to the main point of contention—identity. Mandefero urges that the evidence is insufficient to show that he committed the charged crimes. We disagree.

Gary, at first, was unwilling to identify who shot him when Deputy Glasgow arrived on the scene and questioned him about what happened. This initial exchange occurred while a number of bystanders were close by. But when medical personnel arrived and placed Gary into an ambulance before transporting him to a hospital, he answered the deputy's questions.

Deputy Glasgow testified at trial that after he told Gary he would not tell anybody, Gary told him who shot him.[26] The deputy testified, "[Gary] said it was something along the name of Hailu and some ni[**]ers."[27] Gary also said that he would show Deputy Glasgow a picture of Hailu, that Hailu was in a burgundy truck, that Hailu was from the "Money Gang," and that Hailu was African.[28] Deputy Glasgow recorded portions of this conversation in the ambulance on his smartphone. This recording was played for the jury.

The State presented evidence to corroborate this identifying information. Specifically, it presented evidence that Mandefero had "Money" tattooed on one

---

[26] Report of Proceedings (Oct. 24, 2012) at 146.

[27] Id.

[28] Id. at 148-49; Ex. 10.

8

hand and "Gang" tattooed on the other, surrounded by dollar signs.[29] It also presented evidence from Mandefero's Facebook page, where Mandefero claimed membership in the Money Gang.[30]

Notably, Gary admitted at trial that after the shooting he told Deputy Glasgow that his assailant was Hailu.[31] He further admitted that he was then talking about Hailu Mandefero.[32]

Gary identified Mandefero as his assailant again when he woke up in the hospital, after being transported from the scene of the shooting. At trial, Gary testified that he told his mother at the hospital that Mandefero had shot him.[33] He also told her that Hubbard was involved, and he told his family that if they caught either Mandefero or Hubbard to "[s]erve him how I got served."[34]

Notwithstanding these pre-trial statements, Gary recanted his prior identifications of Mandefero.[35] As we already noted, Gary testified at trial only after being compelled to do so on a material witness warrant.

---

[29] Report of Proceedings (Oct. 29, 2012) at 134.

[30] Ex. 40.

[31] Report of Proceedings (Oct. 24, 2012) at 51.

[32] Id.

[33] Id. at 58.

[34] Id.

[35] Id. at 118-20.

At trial, Gary testified that he only saw Hubbard and that he did not see anybody else. He said he was purposely misleading Deputy Glasgow when interviewed at the scene of the crimes.

But the jury also heard evidence that Gary did not want to cooperate and had a motive to recant his pre-trial statements. The jury knew that Gary was arrested on a material witness warrant as a reluctant witness. Gary testified at trial that he knew detectives were looking for him and that he did not respond to their calls. He told the detectives that he was not going to cooperate.

Gary testified that he still wanted revenge. But he said that he intended to take care of things his way rather than go through the legal system. The following exchange occurred at trial:

> [Gary]: Honestly, I'm not about putting no man away. I don't know how much time he is looking at, but I'm taking, you know, I'm about 20. I know we are around the same age. I'm not about putting no man away for no amount of time.
>
> [Prosecutor]: All right. So you just don't want to see anybody go to jail –
>
> [Gary]: I mean . . .
>
> [Prosecutor]: -- whether they shot you or not?
>
> [Gary]: Pretty much.[36]

The officer who arrested Gary on the material witness warrant also testified about Gary's reluctance to testify. He testified that Gary told him that he did not want to snitch, he wanted to keep things on the streets, and he was afraid

---

[36] Report of Proceedings (Oct. 24, 2012) at 65.

of what would happen to him if he testified against Mandefero.[37] The officer further testified that Gary was "vehemently opposed to come and stand before the court" and that Gary's first words were, "I'm going to f[**]k the case up."[38]

On the basis of this and the other evidence, the jury could have reasonably found that Gary's initial identifications of Mandefero as his shooter were credible. Likewise, the jury could also have reasonably found that Gary was not telling the truth at trial when he recanted his prior identifications.

The State cites a number of extra-jurisdictional cases to argue that Gary's pretrial identifications, alone, are sufficient evidence to prove identity despite the fact that Gary recanted at trial. The most notable of the cases cited by the State is Commonwealth v. Brown, a recent case from the Supreme Court of Pennsylvania, which conducts a thorough review of cases analyzing the sufficiency of convictions based exclusively on recanted identifications.[39] The State argues that under any of the approaches taken by various other jurisdictions, the evidence in this case is sufficient.

We conclude that it is unnecessary for this court to address the approaches of these other jurisdictions in this case. That is because this case is not one that rests *solely* on Gary's pretrial identifications. As the trial court correctly explained when it denied the motion for a new trial, this case "revolved

---

[37] Report of Proceedings (Oct. 30, 2012) at 63.

[38] Id. at 64.

[39] 617 Pa. 107, 52 A.3d 1139 (2012).

much more around the circumstantial evidence than the direct evidence from []

Gary."[40]

Here, in addition to the circumstantial evidence showing motive and

opportunity, there was further circumstantial evidence to support the identity of

Mandefero as the shooter. For example, Mandefero's actions and statements at

the hospital shortly after the shooting at Ezell's also supports the State's case.

Mandefero gave conflicting accounts to police about his whereabouts that

night. An officer who spoke to Mandefero at the hospital testified that he

"appeared nervous" and did not want to talk.[41] The officer then described

Mandefero's conflicting stories. Mandefero first told him that Hubbard called him

and asked him to pick him up at a 76 Station on Renton Avenue. The officer

testified that this is near an Ezell's Chicken. Mandefero told the officer that he

went with his sister to pick Hubbard up at this location.

After the officer asked Mandefero for his sister's contact information, the

officer testified that Mandefero "changed his account as to what happened."[42]

Mandefero then told the officer that he and Hubbard's girlfriend picked up

Hubbard at Chuck E. Cheese in Kent.

Overall, the fact that Mandefero was with Hubbard after the shooting, the

fact that Mandefero does not dispute that Hubbard was involved in the shooting,

---

[40] Report of Proceedings (Jan. 31, 2013) at 25.

[41] Report of Proceedings (Oct. 25, 2012) at 82.

[42] Id. at 96.

and the fact that Mandefero provided conflicting accounts about his whereabouts near the time of the shooting, further supported the State's case.

Finally, circumstantial evidence also supported the State's theory that there were two shooters involved. Gary admitted that he initially told his mother that both Hubbard and Mandefero were involved. And at trial, Gary identified Hubbard as a passenger in the truck.

Officers recovered multiple shell casings from two different caliber guns at the scene—.40 caliber and 9mm. An officer testified that the two different types of casings were in two different areas. Specifically, the bulk of the .40 caliber casings were closer to Gary's car and the 9mm casings were further away.

Officers recovered a .45 caliber handgun in the glove compartment of Gary's car. Thus, neither the .40 caliber shell casings nor the 9mm shell casings came from the .45 caliber handgun. This also supports the State's theory that two shooters were involved.

In sum, the jury was entitled to find that Mandefero and Hubbard were the two shooters. Gary's initial identification of Mandefero as the shooter coupled with the circumstantial evidence that we discussed constitutes sufficient evidence to convict Mandefero of the charged crimes.

Mandefero argues that "the majority of the evidence suggested that there was only one shooter: Hubbard."[43] Mandefero then states that though it was "theoretically possible" that someone else joined Hubbard in the shooting, "no facts made the State's two-shooter theory any more likely than the defense's

---

[43] Brief of Appellant at 26.

one-shooter theory."[44] He asserts that the evidence of two shooters "is equivocal at best."[45] These arguments are simply not borne out by the record before us. A jury is free to choose between conflicting inferences and did so in this case.

Mandefero argues that no rational jury could find that Mandefero was present when Hubbard shot Gary and that the "cell phone [record] evidence conclusively excludes the State's theory that [] Mandefero was with Hubbard before and during the shooting."[46] This simply is not true for the reasons we already explained earlier in this opinion.

Mandefero argues that Gary's statements to Deputy Glasgow were "unreliable, speculative, and at best equivocal."[47] These characterizations are simply inaccurate. And he argues that "Deputy Glasgow bullied Gary into identifying someone."[48] This assertion is not supported by the record.

Mandefero argues that Gary's identification was based purely on speculation. And he argues that "the location of Gary's injuries strongly suggest that Gary did not see who shot him."[49] But these arguments are about credibility

---

[44] Id. at 26-27.

[45] Id. at 29.

[46] Id. at 32.

[47] Id. at 38.

[48] Id.

[49] Id. at 42.

14

and the weight of the evidence. We defer to the jury on credibility of witnesses and persuasiveness of evidence.[50]

Mandefero relies on State v. Vasquez[51] for the proposition that equivocal witness statements pertaining to identification violate Due Process and cannot support a criminal conviction. But while Gary's statements were contradictory, none of them were equivocal. Thus, despite Mandefero's assertions to the contrary, they do not "suffer from the same legal ambiguity" as in Vasquez.[52] Mandefero's reliance on this case is not persuasive.

Finally, Mandefero argues that the evidence does not support a conviction based upon accomplice liability. But there was no such instruction given to the jury. Rather, it convicted on the basis that Mandefero was the principal responsible for the charged crimes. For that reason, we do not further address this argument.

## WAIVER

Mandefero's first assignment of error asserts that "the trial court erred when it denied [his] Knapstad motion at the close of the State's case."[53] This motion is more properly characterized as a motion to dismiss. But Mandefero fails to support this assignment of error with argument.

---

[50] Thomas, 150 Wn.2d at 874-75.

[51] 178 Wn.2d 1, 309 P.3d 318 (2013).

[52] Brief of Appellant at 45.

[53] Id. at 1.

A party waives an assignment of error not supported by sufficient argument or citation to the record.[54] That is the case here. Therefore, we do not address this assignment of error any further.

## MATTERS OUTSIDE THE RECORD

The State argues that this court should disregard matters outside the trial court record. We agree and have done so.

In a direct appeal, the reviewing court will not consider matters outside the trial record.[55] Moreover, a court examines sufficiency based on the evidence admitted at trial.[56]

Here, to support his claim of insufficiency, Mandefero relies on matters outside the appellate record. For example, he extensively discusses a "Citrus nightclub shooting."[57] He argues that this shooting occurred under "remarkably similar facts to those of the Ezell's shooting."[58] And he argues that the evidence "when viewed in the context of both shootings, clearly points to Hubbard being the lone gunman in both shootings."[59] To provide details of this shooting, he cites the State's sentencing memorandum from that case. But no evidence of

---

[54] Skagit County Pub. Hosp. Dist. No. 1 v. Dep't of Revenue, 158 Wn. App. 426, 440, 242 P.3d 909 (2010).

[55] State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

[56] See State v. Jackson, 82 Wn. App. 594, 608, 918 P.2d 945 (1996).

[57] Brief of Appellant at 22-24, 28-29.

[58] Id. at 28.

[59] Id. at 29.

this shooting was presented to the jury, and the sentencing memorandum that Mandefero cites is not in this appellate record.

In another example, Mandefero cites a jail phone call where he allegedly stated that he "had nothing to hide."[60] But again, Mandefero cites a document that is not in this appellate record.[61]

Mandefero provides no explanation for these violations of the Rules of Appellate Procedure. And we see none. While such disregard of the RAPs could result in the imposition of sanctions, we exercise our discretion and decline to impose sanctions in this case.

We affirm the judgment and sentence.

_Cox, J._

WE CONCUR:

---

[60] Brief of Appellant at 18.

[61] Id. (citing Report of Proceedings (Nov. 26, 2012) at 59-60).

17